Mr. Roth. Thank you, Your Honor. May it please the Court. On this appeal, a petitioner challenges the ruling of the Administrative Law Judge who determined that he did not make a protected disclosure under the Whistleblowing Protection Act. And we challenge the Board's findings in two particular ways. The judge held that because no violation of DEA rules, regulations, or policy actually occurred, there could not have been a violation of the statute, and therefore no protected disclosure. And also, the judge held that in any event, the disclosures were made as part of petitioner's normal duties as a special agent with the DEA. Mr. Roth, let me ask you, when you talk about the normal duties issue, you have two aspects to that here. Number one, there's the Kahn job description. Then there is this question of what additional duties he was assigned as, quote, lead agent in the Buford office. We all know what we're talking about there. Have you found any cases that have addressed that kind of a situation where you had a job description, as we do here, and in addition to that, on an ad hoc or some kind of basis, if you will, the individual had been told, we want you, in addition, to report to us in this way? Judge, I have not been able to find anything in this context. The only context that I've been able to find any cases relating to job description are the cases relating to the individual leaves one position and goes to another position, there's always an issue of whether or not that person is in a probationary status or whether he can tack the time on from a prior job. In that context, the issue of job description comes up all the time. I think the case law there basically says that although job descriptions are persuasive, they're not the only indication of an agent's duties. But can a job description or PD be amended orally by a supervisor? I would say not, Your Honor. Our position in this case is that his duties are defined by his job description. Now, I would concede to you that there is substantial evidence in the record coming from his two supervisors that he had certain extraordinary duties over and above his normal DEA duties. For example, he clearly was the individual in the office who paid all the bills. He ordered the supplies. He was the individual in the office that was in charge of getting new office space and accommodating the new office space for DEA. But he was not identified as a lead agent as such, though? No, not in the... In his PD? Not in the PD itself, but, Your Honor, just to be clear, there was one evaluation, calendar year 2001. In every evaluation, Your Honor, if an individual receives an outstanding evaluation within DEA, there has to be a narrative at the end of the evaluation indicating the agent in Buford. Now, that was not part of the critical elements of the job, but just by way of narrative indicating why he received an outstanding evaluation. Significantly, Your Honor, only in 2001 does that designation occur, and there is a reason for that. Beginning in 2001, he was the only special agent in the office, so he had to be the lead agent. The only other people in the office were task force officers. By process of elimination, is that what happened? Right. But then, in the spring of 2001, another agent did come on board, but since he didn't know the ropes, so to speak, in the office, for that year, Mr. Kahn was considered the evaluations. Was it ever indicated in any subsequent evaluation that he was the lead agent? Now, assuming for the moment, hypothetically, that we accept the ALJ's findings on the issue of required disclosure to Mr. Mitchell, what about the disclosure that was made to Oslok during that meeting? Who requested that meeting? Was it Mr. Oslok or was it Mr. Kahn? Judge, I don't think a meeting, I think I understand the meeting that you were talking about occurred in June of 2005, and it was a luncheon meeting in Beaufort, South Carolina. I think it was just a normal meeting where Mr. Oslok came down and sat down with the two agents and said, how are things going? I think it was no more than that. Wasn't it June of 2002? 2002, yes. Or late May of 2002? Was that a regular meeting that they held or was that a special meeting that was called by one of the other parties? Judge, I'm sorry, I don't know the answer to that. By that point, Mr. Kahn had already reported the difficulties to both Mr. Mitchell and to Mr. Oslok. I cannot tell you that that meeting was specifically held in relation to that. It could just have been a normal luncheon meeting. But the issue of Mr. Annis' misconduct did come up at that meeting, and as a result, two things happened. Mr. Kahn recommended his removal from the task force, and during that meeting, Mr. Oslok made the decision to remove Mr. Annis from the task force. So that happened at the meeting. Was he required to tell Mr. Oslok or just required to talk to Mr. Mitchell about that? Your Honor, I think the proper means of doing that would have been to go through the chain of command. In other words, to start with Mr. Mitchell, and then Mr. Mitchell would then go to Mr. Oslok. That's the way it would normally go. But there's no prohibition against Mr. Kahn raising it outside of the chain of command to Mr. Oslok, and indeed, that appears to be what happened here. Mr. Mitchell, in his testimony at the hearing, indicated that he was actually unaware of some of these allegations that Mr. Kahn was making to Mr. Oslok. In other words, there were occasions where Mr. Mitchell indicated that he was out of the loop, so to speak, on some of these things. When Mr. Mitchell testified, he thought that Mr. Annis had been removed from the task force because he started a near brawl with Mr. Kahn in the workplace. Mr. Oslok, however, was aware that there was a recording of violation of DEA rules and regulations relating to confidential sources. So it appears that Mr. Oslok knew a lot more of what was going on than Mr. Mitchell did. And he learned directly from Mr. Kahn on that point? Right. Your Honor, two questions. One, the hearing, the A.J. ruled against Mr. Kahn on the ground that he had not, in the A.J.'s view, made a protected disclosure. He did not address the issue of whether the agency had proved by clear and convincing evidence that in the presence of a protected disclosure, it transferred Mr. Kahn anyway. But there was, as I understand it though, there was evidence presented on the clear, was evidence, is it your view, we'll ask the government too, but was there evidence presented on the clear and convincing question in the course of the hearing? Yes, yes, at length. There were witnesses that were called solely for that issue and no others. Was there any kind of a pretrial order or something? We have the hearing transcript, but was there any kind of a pre-hearing order by the A.J. that said, okay, I want all factual evidence to come in on all issues, even though eventually he did not rule on the clear and convincing? I believe there was, Your Honor. There were some stipulations, I recall, but short of the stipulations, it was understood that evidence would come in, not only on the issue of protected disclosure, but the clear and convincing also. One other question. There seemed to be agreement, the witnesses testified that Mr. Kahn made allegations with respect to possibly violation of DEA procedures and so forth. Do we have those procedures in the record or anything? There is testimony from witnesses about this, both Kahn and the DEA people, but do we have the text of one of these guidelines or regulations? Judge, I believe, if I'm not mistaken, that the agency did put it in the record, in which case it would be in the record, but I couldn't tell you exactly where it was. When we appeared here the first time, Your Honor, there appeared to be no dispute that Mr. Kahn had actually made disclosures of violations of DEA rules and regulations. As a matter of fact, whoever appeared here, I think, conceded that that was the case, and in Your Honor's opinion, I think, in a footnote, you indicate that. Well, it was conceded for purposes of that I wouldn't necessarily read the concession as going beyond that. I think we agreed on what the violation would have been, but at the hearing, the agency clearly did not agree that there was an actual violation. In other words, their position was that because Mr. Kahn intervened, there was no actual violation, and the issue would be whether or not this individual could go out and procure drugs without being established as a confidential source first. There was no doubt that he was not established as a source, and there was no doubt he did obtain drugs. Now, under normal circumstances, we all agreed that that would be a violation. They claimed it was not a violation at the hearing because they believed that he was designated as a confidential source for the local Sheriff's Office, and therefore did not violate any rules and regulations of DEA. In fact, it turned out he was not registered as a confidential source with the Sheriff's Office either because he had never gotten the authorization from the State Parole or Probation Authorities to be used as a CS. The guy had just been released from prison and was not permitted to associate with criminals, so he needed a waiver from probation. That never occurred. What happened was after the drugs were obtained, the Sheriff decided to authorize a one-time payment so that the confidential source would not be sort of hanging out there. In other words, so he could pay for the drugs that he got on consignment. But he was never, as I understand it, never registered as an informant for either DEA or the local Sheriff's Office. And it's clear that the A.J. thought that he was, because that's why he said that there was no violation. In fact, there was a violation, I believe, for all sorts of reasons. First, let me say this. This two-hats theory that the A.J. relied on, the individuals who are designated as task force officers with the DEA task force are full-time. They don't wear two hats. They wear one hat. They are full-time DEA employees. Now, they still get paid by the Sheriff, but they can't just take that federal hat off whenever they feel like it, put a Sheriff's hat back on, and say, okay, we're going to do it a different way. Once they're on board with DEA, they have to do it DEA's way. They can't take off one hat and put another one on. Clearly, that was Mr. Annis' belief, because he expected, notwithstanding the drugs without authorization, he expected DEA to pay for those drugs, and that's what started the problem. He came in with the drugs to the DEA office and said, here's the drugs, pay for them. Mr. Kahn said, we can't do that. He's not registered. We can't do it after the fact. So, after that, the Sheriff authorized the payment, but he was never registered as a C.S. for even Beaufort County, and couldn't have been, because they never had the time to get the authorization from the parole authorities to let the guy do it. Your Honors, I think it's important to go back to the Huffman case on the normal duties issue. I think we've come a long way from what Huffman says. In Huffman... I don't think we need to get started, because you've already exceeded your time, but we'll give you your rebuttal time back. Thank you, Your Honor. We can read Huffman. Thank you. Thank you, Your Honor. And you can have extra time if you need it, since we're going to reimburse him. Thank you. Did you want to first talk about the normal duties question, and address the question that was raised regarding whether there are any cases where an employee's normal duties are sort of expanded by a supervisor, or he's given additional duties. And I would just cite this court to the Fields case, and to quote from that case, quote, It is part of Fields' normal duties to participate in internal investigations when necessary, and the ad hoc reporting channels set up during an internal audit become the normal channels of Fields' employment for those purposes. In other words, in Fields, there was a situation where an employee was instructed to draft a particular memo. There wasn't anything in the Fields' opinion that I can recall where the court said that that was where the duties of his position specifically refer to preparing a memo of this sort. But the employee was instructed by his supervisor to prepare that memo. And what this court said is, well, that becomes part of his normal duties. Now, let me ask you... Is that really a change in the position description at that point orally by the supervisor? Is that a change that can be made at any time by the supervisor? Well, it's in addition to what the duties that are listed in the position description are. Now here, in this case... In addition to, or changing the duties required of the employee? I think in Fields, it was an additional assignment that he was given. So that means if I'm a supervisor in the federal government and I tell my employees, I want you to go out and wash my car, and that's not part of their position description, I can amend their position description in any manner, in any form that I want? No. Obviously, the amendment has to relate to the duties themselves, certainly. Now here, in this... How much of a relationship can it have? If I'm supervising mechanics and I bring my car in and I tell them, fix my car? Well, no. Obviously, that would not constitute part of the employee's normal duties. So how far does it go? How far can a supervisor change and amend, orally or otherwise, a position description? Well, certainly, it's a factual inquiry. It depends upon the facts of the given case. In the Fields case, it was a supervisor instructing an employee to draft a particular memorandum summarizing the events that occurred. So it obviously still relates to their normal duties. It was just sort of an extra assignment that employee was given. And this court held, well, that becomes part of their normal duties. In our case, the testimony was clear from both Mr. Mitchell and Mr. Ozlak that Mr. Kahn was tasked with serving as the lead agent in that office. And part of his assignment was to report to Mr. Mitchell on a daily or near-daily basis regarding the operational information that was coming out of that office. And that's exactly what he did. That's what his conversations with Mr. Mitchell concerned. As the Ministry of Judge held, he was performing the very core purpose of his job. What about his reporting to Mr. Ozlak and meeting with Mr. Ozlak? I want to make a couple of points on that issue. First, that did not seem to be the... I don't think that the argument was raised in Mr. Kahn's brief that the Ministry of Judge erred in that respect. In other words, that Mr. Kahn was somehow going outside of his normal chain of command by talking to Mr. Ozlak. That being said, Mr. Ozlak did testify that the discussions that Mr. Ozlak had with Mr. Kahn were still part of Mr. Kahn's normal duties, that he expected Mr. Kahn to come to him in this situation and talk with him regarding what happened with signing up this confidential source. And that's on page 74 of the appendix. Plus, Mr. Ozlak also testified that he was already aware of what had happened, that he had had discussions already with Mr. Mitchell. And that's on page A79. And then, although I think later he does say, well, I also heard some of this from Mr. Kahn. Directly. I'm not sure if he says directly or not. I think he said he heard it from both. But what was important also, that Mr. Kahn and Mr. Mitchell testified that he could not specifically remember if in this instance he had discussions with Mr. Ozlak, but that he probably did, because that's probably what he would have done in a situation like this. That's on page 241 of the appendix. But perhaps most importantly, Mr. Kahn testified that Mr. Ozlak, he had this luncheon meeting with Mr. Ozlak, and it was Mr. Ozlak that said to him, explain to me what was going on with Mr. Annis. Tell me what happened here. Which is akin to what happened in Fields, where the employee was told to prepare a memo explaining what happened. Give us a factual summary. And that becomes part of your normal duties. Moreover, the fact that Mr. Ozlak said that to Mr. Kahn, again, this is Mr. Kahn's own testimony. It's on page 397 of the appendix. The fact that Mr. Ozlak said that to Mr. Kahn indicates that he was already aware of the events that had transpired. So it can't be a disclosure if he already knows about it, in other words. Mr. Payne, let me ask you this. It's sort of the same question I asked Mr. Raw. Mr. Raw said that there was evidence put into the record on the clear and convincing point. Is that correct? There was. That's correct. That being said, our position is that the administrative judge never reached that issue. So in the event that this court disagrees with us and the administrative judge as to the two primary issues, the normal duties question, the question of whether or not Mr. Kahn had a reasonable belief that he was disclosing a violation of law, rule, or regulation, if the court disagrees with us on both of those issues, the proper course would be to remand to the administrative judge to reach that question. So you're saying the judge, if we got to that point, and you would say we should not, but if we hypothetically, if we did get to that, you would say we should remand to the administrative judge for him to make a ruling based on the existing record. That's right. No new evidence, just the existing record. That's right. There was considerable testimony in the hearing regarding that issue. Well, let me ask you, though, in your brief, so in other words, you're saying if we don't affirm on the basis of the AJ's decision, we should remand for the AJ to rule on the clear and convincing point based on the existing record. Now, in your brief, though, you do argue, you say that the government presented clear or the agency below presented clear and convincing evidence that it would have taken the transfer action in the absence of the Kahn disclosures, right? That's right. Although I think we also said that the case should be remanded. I mean, is there, I mean, it seemed, and the AJ kind of said in the last paragraph of the decision that it's a shame this arose out of Mr. Kahn performing his duties. Suggesting, perhaps, that he feels none of this would have happened if Kahn hadn't made these disclosures. I'm not using disclosures in the term of art sense. I'm just saying the communications. I mean, I'm wondering if... You're wondering, is there really an issue there? I mean, is there really, if we got to the point, would a remand really accomplish anything? I mean, if it goes, if we affirm the AJ's decision, case is over, obviously. If we say the AJ erred in that regard, then we have a choice. We send it back, in which case the AJ looks at the record. It may come back up here again. If Kahn wins, the government would appeal. If the government won, Kahn would appeal. And here we are, as a prudential matter, based on the fact that there's no new evidence going to come in. Doesn't it make sense for this court to look at that issue? Well, usually we allow the Ministry of Judge to reach an issue first. That being said, we certainly did, in our brief, present considerable evidence on that issue, on the clear and convincing issue. If you look at, and what Mr. Kahn seemed to argue was that, well, because his disclosure, because the government conceded at the hearing that his disclosure was a contributing factor to the decision to transfer him, that precludes us from demonstrating, by clear and convincing evidence, that he would have been transferred anyway. And our point is simply, well, those are two separate analyses. And if you look at the timeline here, the series of events, Mr. Kahn was transferred three years after he had his conversations with Mr. Mitchell and Mr. Ozelak. Given that long timeline, the numerous intervening events, the fact that the relationship between Mr. Kahn, the U.S. Attorney's Office, and the Sheriff's Office deteriorated over time. I think that's true, but it does seem that the trigger were the, what we'll call the anise matter, if you will. And of course, some of the time that was consumed in there was taken up with the OPR investigation, various back and forth. I mean, I'm just, it... Again, we conceded it was a contributing factor, but it wasn't the only factor. Is it the agency's position here that he would have been transferred, that it could show to a firm and abiding belief, which is the standard for clear and convincing evidence, that it would have transferred him if this whole thing with anise had never started? Well, and this court held in the Watson case that 1221E2, which is where, which is what the section of the statute talks about the clear and convincing standard, does not require that the adverse personal action be based on facts completely separate and distinct from the protected disclosures. And in other words, there may be situations, and this is most likely one of them, where there is overlap. What would be the reason for transferring and if the whole con chain, if the whole anise chain of events hadn't started? Well, for example, and I think it's the Murano case that suggested this, the agency might be able to show that it would have found out this information from another source anyway. In other words, there would have been disclosures from someone else. And so for that reason... But there weren't in this case. There weren't. No, there weren't. But there may have been. Let me ask you one thing. Were there any, were there ever along the line any kind of settlement discussions in this case? I don't know the answer to that. I can just say that in the context of this appeal, there were not. I don't believe there were any in the context of the prior appeal. If I could focus on the reasonable belief question, the administrative judge's decision on that issue really focused on the testimony of the witnesses and the fact that the conversations, and I think that there's a factual dispute on that issue, but the administrative judge credited the testimony of the witnesses and the documentary evidence and focused on the fact that they're really... Mr. Kahn, when he was having these discussions with Mr. Mitchell, he was not in fact disclosing any violation. The nature of the disclosures, the conversations were Mr. Annis wants to sign up this confidential source. Is there a way that we can make this happen under DEA policy? Can we sign him up? There was a lot of back and forth and ultimately they determined that no, it would not be a good thing for us to sign up this confidential source. It would have to be approved at a higher level. It's not something we want to do. But the discussions were not, oh, we have a violation of law here or even a violation of policy. What do we make though of the... No, I mean, I think that's a fair characterization, but what do we make though of the Oziluk testimony, I guess at 136 to say 138, where he basically says what happened here is Kahn headed off a problem. I mean, he stepped forward and prevented something going off the tracks. And if you look at the Reed case, which is the case that we cited in our brief, Reed case is the case where this court held that even if there is no actual violation, if an employee is disclosing an imminent violation, that that's enough. And that case involved an employee who was instructed by their supervisor to violate policy. And the employee went to another official, disclosed it. And the court said, well, that falls within the whistleblower statute because we want to encourage employees to disclose information like that just because a violation never actually... You know, there's also, I can't remember the name of the case, that case involving the woman who worked for the agency that transported nuclear waste or radioactive material. And she came forward and said, this new procedure is going to be problematic. It could lead to accidents. Well, that was a risk to life. It wasn't a rules and regulations issue. And our point is, well, twofold. First, there in that case, there was an imminent violation that was about to occur. Here, there was no such imminent violation. But secondly, what's important about Reed is what this court said, the parameters that this court created. This court said, in holding that a disclosure of an impending action can qualify under the act, we do not intend to convey the idea that any mere thought, suggestion, or discussion of an action that someone might consider to be a violation of law, rule, or regulation is a justification for a whistleblower complaint. Discussion among employees and supervisors concerning various possible courses of action is healthy and normal in any organization. It may, in fact, avoid a violation. And if you look at the administrative judge's holding, what he said is that here in this case, Mr. Kahn and Mr. Mitchell were not discussing violations or even imminent potential violations. They were discussing, can we sign up this source? Is there a way we can make this happen under our policies and procedures? I think it's normal functioning of the business of the office. That's right. So for that reason as well, the administrative judge's decision should be affirmed. But what happens if, in fact, the action was never approved and it did become a violation? And at that point in time, it was reported as a violation. That would be a different case, obviously, from ours. And here we know... Hypothetically. Let's assume for the moment that there was action to try to comply with the regulation. Subsequent to that, the regulation was breached and it was reported as a breach of the regulation. Well, that would be a different situation. If the employee says, we've got a breach here, we've got a violation here. The employee said, first, let's see if we can correct the problem. But the problem was not corrected. And then the employee reported the uncorrected problem. Does that become a disclosure at that point? Well, there always has to be a reasonable belief that they're disclosing a violation. So it would obviously depend on... Assuming that he believed at that point that it was a reportable violation. If that violation was imminent at the time, then yes, that would be a protected disclosure. In other words, if it was about to happen. And if it happened that way then, and it was reported at that point, not about to happen, but it happened. Yes, and that would be the same. That would be a disclosure. But again, that's not our case. It's not our case here. Very close though. No, because respectfully we disagree because there was... Again, the nature of the conversations were not, you know, oh, there is a violation or even a potential violation. It was, can we sign him up? I don't know the answer to that, Mr. Mitchell. Let's look into it. Let's figure out, can we actually do this? They spent time looking into the policies and I realize I'm past my time, but there was a question about the policy. Oh, you have time. There was a question about the policies. Some of the policies are in fact in the appendix. There was something, I think you're right, Mr. Petty, there was some stuff at the back of one of the volumes. I can't remember which one it was. It's A1149. And just to emphasize... I'm sorry, what is it? A1149 is where they begin. And just to emphasize, of course, it is Mr. Kahn's burden to demonstrate a violation or that he had a reason to believe it was a violation. The first couple of pages talk about documenting a confidential source. In this case, we never got to that point because DEA determined it wasn't going to sign him up. But what's interesting is that a page, I'm looking at page 1152, and this gets to the question of the two hats issue. In other words, we have a task force member, Mr. Annis, who was a member of the task force, but he was also a sheriff's employee. At the bottom of 1152, it says task force officers permanently assigned to DEA shall comply with all operational plan requirements when performing their duties as a deputized TFO. However, when the TFO's parent agency requests his or her assistance in an operation led by the parent agency, the requirements of this division order shall not apply. So this order, although I do want to note this order is dated after the conversations Mr. Mitchell had with Mr. Kahn, this order contemplates a situation like here where Mr. Annis, while he was a task force member, he was also a sheriff's employee and attempted to sign up this confidential source on behalf of the sheriff's office. Let me ask you one final thing as a process matter. Do you think in future cases, Mr. Priam, where we have a situation where it's been determined the board has, and I'm just throwing this out as a question, it's not really a criticism of either you or Mr. Roth, or the agency counsel below or Mr. Roth, but as a general matter, do you think in a situation like this where a case is before the board for a hearing on the merits and where the AJ hears testimony on whether there was a protected disclosure and he also receives evidence on the question of whether there was clear and convincing evidence apart from that for the agency action. I mean, it seems to me that just as a process matter, it's best in a case like that, that even if the AJ, as happened here, rules in favor of the agency, that he or she nevertheless also make a finding with respect to the clear and convincing point so that we don't find ourselves possibly in the situation we have here where if we were not to affirm, it might have to be sent back. I mean, do you have a thought on that? As government counsel? Obviously, I can only speak to this case, but I will say that I think it would have been, we agree that it would have been helpful if the administrative judge had in fact reached that issue here, notwithstanding the fact that he ruled in our favor on the first two issues. We have a jurisdictional question, that's another matter, but it does seem that where all the merits are being heard, it might make sense. It helps to have all the issues resolved, obviously. All right, thank you. Thank you. Your honors, on the clear and convincing issue, your honors could remand and ask for additional findings or based on the record, and I will represent to your honors and I think the agency will do likewise, the record is absolutely complete. I think Mr. Preem said that. It's absolutely complete. He would be just asking for a remand for a decision based on the existing record. This is a unique situation, your honor, because it's a situation where the issue of causal connection, which is usually the preeminent issue in these cases, these whistleblowing cases, was actually stipulated to by the agency. In other words, they stipulated that there was a causal connection between the transfer and the whistleblowing. In fact, this is unlike any other case that I've seen. There are cases where causal connection has been found, but the board has also found that the agency has met their clear and convincing burden. But those are all cases where there is also a disciplinary issue involved or performance issues involved. In other words, there has to be a reason over and above the whistleblowing why the person was either removed or transferred or whatever. Here, there is no possible reason because there's no discipline. The OPR investigation, which took about a year, completely cleared Mr. Khan of all wrongdoing. The agency repeatedly at the hearing conceded, number one, that there was no discipline on his part, no wrongdoing, no giglio impairment on his part at all. As a matter of fact, the agency took the position that the U.S. attorney's claim that he had a giglio problem was false and pretextual. They took that position at the hearing and they disagreed. Their own chief counsel's office and OPR disagreed that there was a giglio problem. As a matter of fact, agency witnesses testified that they were blackmailed by the U.S. attorney's office to transfer Mr. Khan out of the agency. In a situation where you do not have a disciplinary issue, you don't have any performance issues, the only thing that the agency was able to point to was, well, we had to get rid of him because he couldn't prosecute his cases within the district because the U.S. attorney's office took the false position that he was giglio impaired and wouldn't let him testify. Therefore, his cases weren't going through the system. Now, DEA disagreed with that assessment but felt they had no choice but to remove him to send him to another district. So you're saying this isn't a case where there was any animus on the part of people in the DEA chain of command. They just, in your view, bowed to external pressure. Right. They bowed to the wishes of the United States attorney's office. As a matter of fact, your honors, you mentioned a settlement. There was a settlement that was attempted to be brokered with everybody involved before litigation even came about. The U.S. attorney's office said, we want him out of South Carolina. Let's not get into things that are not on the record. This is in the record. This is all in the record, your honor. The settlement? Yes, what I'm about to tell you is in the record. It came out repeatedly during the testimony of the witnesses. DEA was going to accommodate Mr. Khan and send him where he wanted to go outside of South Carolina to one of the offices in North Carolina where he was raised. DEA agreed to do that. There then came a point where the United States attorney's office said, we're not going to go along with that. He's got to go somewhere else. If he goes to North Carolina, we're going to take the position he's giglio impaired and we're going to go to the U.S. attorney's office there and poison the well there as well. So consequently, the settlement that tried to be reached among the parties never got off the ground because the U.S. attorney's office in South Carolina said they wouldn't abide by him going to North Carolina either. So consequently, he was sent to Atlanta and that's why we have the litigation. Okay. Thank you. Thank you. The case is submitted.